I will call case number 19-10991 Inclusive Communities v. Heartland Communities and we'll begin with Mr. Daniel. May it please the court, my name is Michael Daniel, along with Lola Bechera, I represent CFL and the planet below, Inclusive Communities Project, which I will refer to as ICP. Mr. Daniel, I want to clarify something concerning our court's existing precedent in the Lincoln case. In your first issue, you state you're raising this disparate impact point simply to preserve it for further review. In other words, you concede that Lincoln controls on this point, and therefore I'm not clear why you went to such lengths about it. We can't change an opinion by our court, except through the online process, but do you concede that you can't win on the disparate impact point? No, your honor, we make the arguments that in fact, under Lincoln, you said Lincoln controls and you raise this only for possible further review. That's what you said in your brief. And we also said in our brief, your honor, that even under Lincoln, there are major distinctions between that opinion and the facts in this case. For example, there is a change in the rule, which was specifically referred to as a reason not to apply the robust causation principle in the Lincoln case. Second, Lincoln mentioned specifically that there was a different standard if what the plaintiff was trying to do was not require affirmative action by a private landlord, but rather remove restrictions on private owners' willingness to rent to and lease to low-income affordable tenants. And that is in fact distinguished. The district court clearly thought that Lincoln applied and applied it. We think that it is, and have argued that it is in fact distinguishable on that as it is on the disparate treatment case. But it is a broad and if we can't distinguish it, then it will apply. I may know disrespect by the audience. Well, in your footnotes, you say I think these argument on this issue is made for the purpose of seeking further review of the current Fifth Circuit standard, completing a disparate impact claim. I took that to mean you're open for unbond treatment by our court or Supreme Court review, but maybe I'm reading it too narrowly. Go ahead. Well, while we're on the subject of Supreme Court review, I didn't see anyone cite the fact that U.S. Supreme Court did deny cert in Lincoln. That's kind of important. I mean, it's not dispositive of the issue from the standpoint of the Supreme Court, but it does mean they did not perceive a reason to take it, right? Yes, Your Honor, and they notified the court. Yes, I know that, but I'm saying that the proper citation of a case is first cert, you know, petition for cert filed and then it's cert denied when it's within the last two years and particularly when it's the whole focus of the case. I just was pointing that out, but that's fine. Go ahead. Yes, Your Honor. On the distinction between this case and the case in Lincoln is typically one on the robust causation. In this case, we have robust causation on a small, identifiable, enumerated group that is within the control of the defendant. This is not the issue of whether or not the defendant can control the makeup of the DHA's makeup of the voucher population and the existence of the voucher population inside Heartland. While the number of voucher families and Black voucher families in the general DHA program are not under the control and are not within the authority of the defendant, the number of voucher families in its boundaries is directly under the control of the defendant. This is a critical distinction between this and Lincoln. The other critical distinction is that Lincoln lays open the possibility that when you are trying to impose an affirmative obligation on a private landlord, there is a stricter test for robust causation than in the Heartland cases as disparate impact liability. What you're trying to do is remove obstacles to private owners who are willing and want to provide housing to low-income persons and persons of color, and that that is another crucial distinction. But if they want to consider that point about, so I own property, I do not, but let's pretend I did own property in Heartland and I want to rent to somebody with a voucher and I'm being prevented by this rule, I would have to sue not a group that Right? I mean, how do you have standing for that argument on behalf of the landlords? The standing is set out in plain and great detail. Many of the tenants who, in fact, are in Heartland were assisted by the Inclusive Communities Project to get there. It involved spending money to get them there. No, no, I'm not saying that you can't represent tenants. I'm saying the person that is not allowed to rent their house, they now have fewer people they can rent their house to, that's the landlord. You all don't represent the landlord, you represent the tenants and the prospective tenants, right? That's who Inclusive Communities is representing, right? Yes, Your Honor. And we don't doubt the standing on that. That landlords are being prevented from doing something they want to do. They're the ones that have to sue. And I don't see how you have standing for the landlord. That's the question. We have standing for the landlord. We don't have standing for the landlord, we have standing for the injury. And the injury in this case, under the Fair Housing Act, is the exclusion of the black tenants from Heartland because they're on vouchers. And that exclusion is being accomplished because Heartland is specifically saying that they are not eligible to rent from owners. As a matter of fact, that is an infringement on the property owner's rights, but it's also a direct infringement on the tenant's rights to contract with a willing owner for a voucher. The fact that it is also infringing on someone else's rights doesn't take away standing to challenge the rule that is directed specifically at the voucher tenants and is accomplishing it by not making it a criminal offense for the voucher tenants to live there, but by making it an offense for the voucher tenants to live there. It has the same injury and it has the same effect. And it is the same obstacle that, in the Jambo and the Zone case, as referred to in the Supreme Court, TDHCA case, the city would say, didn't say you couldn't live there, tenants. It said, developers, you can't build low-income housing here. And whether the developers sued or not, the tenants also were able to sue that restriction, against that restriction, on the developer's right in Huntington or in the other cases cited in the Supreme Court that lied to Heartland's disability. The developers did sometimes sue in those cases, but whether they sued or not, the tenants had the right to recover and to bring up the injury to themselves through the restriction on the owner's rights. Move on to the Vicksburg treatment case. And distinguishing that also from Lincoln, in one sense, Lincoln found that there was no viable treatment case there because ICP was asking the panel to basically say that no tenants, no voucher tenants with a no-black rule, and that that was not appropriate for district treatment. In this case, there is a completely black population that is being excluded by the no-voucher rule. It's flagged and put in detail that it is 100% black voucher tenant population in Heartland. But what proof do you have that Heartland is making this voucher rule to eliminate African-Americans rather than to just, they don't want tenants who have vouchers? I'm not agreeing with such a concept. I'm not agreeing that they should do that. I'm just saying, how do we know that it's based on race rather than something else? We've flagged those factors in the complaint. Right, but you have to include facts. I mean, you can always accuse somebody if anyone accused them. I can say you have this viewpoint, and there we go. But there needs to be some facts to support that. So what facts do you have? I know you have the numbers, but what facts do you have to support that Heartland said, whoa, we have too many African-Americans in this town. We need to get rid of them. Let's get rid of the vouchers, and that'll accomplish that. What evidence do you, that was in quotes, what evidence do you have of that? We start with McDonnell Douglas framework where we must start, as said in Lincoln. And in fact, we have black tenants who are not only for rental in the Heartland units, they are renting those units in Heartland. When they are excluded, those units will continue to be available. It is likely, we show that, more likely that they will be occupied by a predominantly whiter population. That's the start of McDonnell Douglas. Those facts are not conclusory. Those are, they're flat, and they're plausible facts. In addition, we cite other evidence. Part of the other evidence is going to the next step of McDonnell Douglas. And that is, given that the only reason for the exclusion of these black tenants is if they're on vouchers, there has to be a legitimate nondiscriminatory interest reason for that choice. There is no legitimate reason, because no reason for that rule has ever been given. It wasn't given during the enactment considerations in the town. It wasn't given when ICP asked for the reason so they can negotiate a less discriminatory alternative. There was nothing ever presented to the district court, and nothing has ever been given to this court as legitimate nondiscriminatory reasons. We plead that there's no legitimate reason. One of the reasons for that is they give legitimate reasons for the limitations on the number of non-vouchers, but they give no reason for the exclusion of vouchers. None at all. We show that it is in fact discriminatory in its effect, not under the disparate impact, but just under the village of Arlington Heights discriminatory effect. The discriminatory effects of the no voucher rule are much stronger here than they were in the village of Arlington Heights, and we show it in a variety of statistics, a variety of calculations that are very specific, that are not general. We also show the timing of it. The timing of it benefits whites. Just as blacks are increasing, they put in the rule, that means there will be no more increase in blacks, there will be a decrease in units of blacks that are likely to be occupied by whites. It is in fact, without reason, no reason given, a restriction on private owner rights. We're not trying to enforce that owner right. What we're using is evidence of the fact that there is no reason is means, and it's consistent with under McDonnell Douglas, of a prohibited reason, and that reason being race. The complaint is fled in the context of McDonnell Douglas, and in the context of the village of Arlington Heights, including that this exclusion of the black tenant is inevitably foreseeable. It's foreseen, it's the purpose of the rule. In fact, the rule will be enforced. It'll be enforced by state court, it'll be enforced by fines, it'll be enforced by injunctions. This is not a golf, it's not a bridge club where it's just keeping score. This rule has the force of law, and interferes with both the tenant and the owner's right to contract on a prohibited reason. Okay, thank you, Mr. Daniel. Ms. Forden, unmute yourself, please, and respond. May it please the court, my name is Amy Forden, I'm here on behalf of the APELI. As the court has already recognized in Judge Barksdale's comments, and also Judge Haynes, this case is determined and should be determined under the Lincoln precedent that was set last year. Procedurally, our motion to dismiss was filed before the Lincoln opinion actually came out, and then the Lincoln opinion came out before the court, the district court entered its order, granting our motion to dismiss. The motion to dismiss was granted because the statistical disparities that are alleged in the amended petition do not show a causal connection to meet the robust causality requirements that was established in both Texas versus ICP, and then again, when this court actually decided ICP versus Lincoln. That case is controlling in this case, because the statistical disparities that have been alleged are statistical disparities that existed completely independently, and before the policy. So what about the difference here? So in Lincoln, you had the issue of the court was concerned that you're somewhat forcing a landlord to take voucher tenants. Here, this is the opposite, you're precluding landlords from taking voucher tenants. So does that distinction change the outcome? I don't believe it does from the standpoint of the statistical disparities that have been alleged. The actual analysis goes to what is the effect of the policy, and the effect of the policy is to limit Section 8 voucher recipients. However, to prevent or to reduce the number of Section 8 voucher recipients. Again, unlike some of the factors in Lincoln, I mean, everybody knows I descended from the denial of rehearing on bonds. I don't agree with Lincoln, but I'm bound by it. But the difference there is you were talking a little bit more globally. Here, we know who the voucher tenants are, and they're all African American. Why isn't that at least different from the facts in Lincoln? Well, here with the voucher tenants, even though we know who they are, the number of voucher tenants that are in the community, that was not determined by the existence of this policy. That was determined individually, independently before the policy was enacted. This is very similar, I believe, to the case, to the disparate impact case in Wardco versus Antonio. In that case, the concept was that they were not promoting non-whites for certain jobs, or they were not hiring non-whites for certain jobs. It turned out in that case that the applicant pool of non-whites in that case, the applicant pool was mostly majority non-whites, which is similar in this case, because what the allegation is that ICP is alleging that the majority of the voucher recipients are black. We know that to be the case, since the allegation is that 100 percent of the residents are black. But the fact that they have come into the community in that fashion is not what the effect of the policy is, because we always have to go back to the effect. It's the effect to disproportionately, adversely affect minorities. In this case, the answer to that is we don't know, because we don't have any facts to determine what the overall racial composition of Heartland is. I think that really is the key. We need to know the numbers of African-Americans. Do we then have a case? If all of the voucher recipients are African-American, everyone else in Heartland is not African-American, do we then have a case? Yes. I think that presents a hypothetical situation where, for example, if the population of Heartland was 75 percent white and 25 percent African-American, and the African-American population in Heartland was then 25 percent African-American, but also all of those were 100 percent on vouchers, then I can see the argument that that presents a disparate impact if you remove all of those people who could only enter Heartland because they were on vouchers. But we don't know that from the facts that have been pleaded, because we don't know how many of the residents, and that's another distinction that is important in this case, is that since this is a single-family home community, we're not just talking about renters, we're talking about residents, because the population of people who are excluded or excluded is renters and homeowners. So, since we don't know the racial composition, the percentage of African-Americans on vouchers, what percentage of them make up African-Americans in the community as a whole, we don't know that it's going to have a disparate impact. But if you have, I mean, let's assume, arguendo, that the decision-maker in Heartland does not want African-Americans in the Heartland community. They can't just issue a policy that says no African-Americans. That would be fairly obviously thrown out and very problematic. So, then they think, well, how do I get there without anyone knowing I'm getting there? And that one can't be 100 percent effective, because as you say, you have a rich African-American who comes in and buys a house. There's not much that the assuming arguendo Heartland person can do, and I realize this may not be the case, just assuming arguendo, but they can sure reduce it knowing that all the voucher holders are African-American. So, wouldn't that be a racial motivation to issue this rule, even if it's not 100 percent effective in meeting the desires of this assuming arguendo Heartland person? I understand where you're coming from with that. I think the issue with respect to the pleadings, when we get back to this case, is that we know of the number 96, but we don't know how that number works in the overall scheme of the racial composition of Heartland, other than the plaintiffs did allege that the number of Section 8 voucher holders in Heartland has not made a substantial difference in the racial composition of the community as a whole. That was pleaded in paragraph 76 of the complaint. Since we do know that the racial composition has not been impacted by voucher recipients as a whole, I don't think that this is a situation in which excluding the voucher holders specifically was intended as a means to reduce the number of African-Americans. Another point. I'm sorry. Can you remind me the number of homes in Heartland? It's alleged in a petition that it's around 2,000. Opposing counsel says in his blue brief, page 51, that Heartland has never provided a reason for the 2018 policy. Is that true? From the standpoint of if they were asked did they provide a public reason, did they issue a statement about this particular provision, that is true. There was no particular reason given. However, this provision or this policy change came at the same time as other policy changes that affect renters in general and landlords in general to reduce the number of rentals. It was stuff about people that were criminals and so forth and putting voucher holders in the same category with criminals and so forth is a bit disturbing. Even putting aside the racial implication, it's disturbing because these are people who cannot be criminals to be voucher holders. What I'm referring to is also the other provisions, the other policy changes that have which were to reduce the number of rentals of homes that landlords can own. The purpose given for that was to reduce investor landlords from coming in and buying the properties in Heartland in general because the interest of the homeowners association was to encourage home ownership and participation in the community. They wanted people who are actually owning their homes and taking part in ownership and actually spending more time in the community. We're dealing with a 12B6 and you've gotten a little far afield in answering the questions. We're bound by the amended complaint and whatever attachments might be with it. So, please try to stick with that in the concept of your answer. So, you were asked, has any reason been given? Is that apparently alleged in the amended complaint or something else alleged that you want to bring to our attention? Your Honor, it's alleged in the complaint that no reason was given with respect to this particular provision of the no section 8 housing. What I'm suggesting is that in addition to that in the complaint, it is alleged that the reason given for other policy provisions at the same time were to decrease the number of rentals in general in Heartland. And that reason was given in the same context. It was at the same time. So, what I'm suggesting is that there was an attempt to reduce rentals. So, to promote homeownership. And that was at the same time as the section 8 voucher. So, one result of reducing rentals would also show that section 8, because section 8 only affects renters, then the section 8, the lack of or the less rentals discourages the investors from actually owning homes to rent to section 8 voucher recipients. So, that's a reason given. We want to increase homeownership. We don't want this just being a community. Is that alleged in the complaint? Yes, Your Honor. That is alleged in the complaint. So, a reason was given? It was a reason given for other provisions that do relate to this reason. All right. Thank you. Jumping back to Lincoln and whether that case is or is not distinguishable from this one. So, in Lincoln, you had private owners who were declining to participate in the section 8 program. They wouldn't take vouchers. Here, some of the private owners had previously accepted renters with vouchers. And then the HOA creates a policy that, among other things, forbids them from doing so. And does that distinction matter? I don't think that that distinction matters in this case, because I think that those landlords who are subject to that rule, they are part of the homeowners association and the decision-making process and subject to any kind of policy changes that are made in the community. The community did not enact this policy without reference to what the owners wanted. I know that is outside of the record, but just as a point of that, I think that's a distinction. And I think that otherwise, I think the other issue is we always have to go back to what is the disparity that is alleged. And in this case, the disparity is alleged very specifically to voucher recipients. It's not that this policy is going to have an adverse impact disproportionately after it takes effect. It is that all of the factors that exist prior to this policy show that there are more black section 8 voucher recipients that could be affected in this already. But that was not created by this policy. That is something that existed before. With respect to the disparate treatment claim, there are no facts to demonstrate that there was any relation between this policy and rape. What facts would you expect? Again, in this current world, there are certainly people who express racism, but there are people who feel racism but do not express it in trying to find another way to satisfy their particular improper goal. And so I don't know that we can just expect everybody to run around making racist comments and that that's the only way you can prove this. How would you, what would be enough in a 12-6 context for them to plead to support this short of a racist blog or post or something by Heartland? I think in looking at the disparate impact, because that's really what the plaintiff relies on for disparate treatment is to use the circumstantial evidence of impact. I think it has to be factors that show that there is an exclusion of these types of voucher recipients that it is based on race. But how would you show that short of a Twitter post or something like that? How would you show that when they hadn't had a chance to get the documents and any witnesses to come forward? This is a 12-6. So they have to plead what they know. And as I said, I think there are people who hide racist motives. Certainly people who say it, but there's people who hide it. And then there's of course people who don't have it, not suggesting otherwise. But that middle ground, the people who have it, but don't want to say it and find a way around saying it, how would you ever prove that? Short of the circumstances such as this one, that everyone affected by this is a particular race? Where I think that the problem is with everyone affected by this is of a particular race, is that we're not looking at that point at percentages or a comparison between percentages disproportionately impacted between the races. At that point, we're just looking at numbers. And when we do that, at what point does that number become important? So we're talking in the record on this case, 96. What if that number was two and of the 2,000 homes, there were two Section 8 voucher recipients who existed or who were renting in this neighborhood and the policy affected two? What if it was five? What if it was 10? At what point does that number become significant? What if it was this case where it's progressed up? It started maybe in the two neighborhoods and then it keeps going up every year and boom, that's when they stop it. They're like, wait a minute, when it was two, maybe we could overlook it. But now it keeps going up every year and short of Heartland interceding, no reason to think it wouldn't continue to go up. What we have argued in our brief is that there are no facts alleged that demonstrate that Heartland was aware that the Section 8 population was going up exponentially like that or in multiples like that. There are no facts to show that. You can figure that out after the fact, but if you were looking at what was their intent at the time, how would you be able to determine that if they didn't know how many families were actually Section 8 families versus black families in the community? Of which we do not know. We don't know the percentage difference between what percentage of the community consists of African Americans and what percentage of that population is this percentage of. So should exclusive communities have been given an opportunity to amend to give them that data? The district court determined that there should be no opportunity to amend because they didn't ask to amend. This is a dispositive point. Should we give them the opportunity to amend? I realize the district court has a lot of discretion on that and maybe we can't do that. But if those numbers are out there, what if the numbers are there are no other African Americans in all of Heartland? That would seem fairly significant. And then to say, sorry, you can't do that. Although we're now making that the key point, I don't know. You tell me, what do you think on that? I think that's a good point of what if the only African Americans in Heartland were Section 8 voucher recipients? I think that would be a very significant fact, but that was not pleaded. And I don't know. I think that any plaintiff has a duty to investigate that before bringing the lawsuit. And that's what the Supreme Court cautioned against when it came up with robust causality in the first place. So should Mr. Daniel have driven down Heartland, knocked on every door and looked at people and decided what he thought, what race he thought they were, which is not always determinative by looking at people. So how would he know? How would he get those numbers? Um, I think that's something that the plaintiff would have to investigate at that stage before actually bringing the lawsuit. But how would he invoke race? How would he investigate it? How would he find out? I mean, at this point, Mr. Daniel does know that the 96 households that all have Section 8 vouchers are also African American. How does he find that out? I mean, I think that there must be ways, and I'm not a plaintiff's attorney on this, but there must be ways for him to determine what the percentage of renters are in Heartland. Okay. Well, your time has expired. I'll ask Mr. Daniel. So Mr. Daniel, please unmute yourself and tell us why do we not have this number? Why don't we have this number of what, how many other African Americans there are besides the voucher holders? The reason we don't have the number is that the census data boundaries do not coincide with Heartland. Heartland is in a census tract that is about 14% African American. But you cannot go in and get the specific racial composition of Heartland because it doesn't coincide with any census tract boundaries. How would Heartland know its own racial composition? Well, Heartland would know that the vouchers that a lot of Blacks are moving in, relatively speaking, because it's a small community. The kids go to the school. They check with DHA. It is a consistent source of issues and contentions about vouchers being Black. It is imminently foreseeable that if you get rid of vouchers, you'll be getting rid of Blacks, and that is what, in fact, we plan based on. But what if it turns out the entirety of the rest of Heartland is all African American? I know that's not the case, but what if it was? Then this would be a completely frivolous lawsuit. So how do we know those numbers, and how are they not relevant? Donna, they may be relevant in one sense to a segregation, a racial segregation case. What we're talking about here is a disparate impact on a completely Black population. But Donald Douglas is not... I'm not asking for looking at their racial motivation. No, but the racial motivation, for example, from a Donald Douglas can apply to getting rid of one Black tenant or one Black employee or one Black contractor. The fact that you're getting rid of 96 with one policy moves that impact to, in itself, supportive of intent. We're not more white. What we're alleging is that the units that will be vacated by getting rid of the vouchers, the Black vouchers, are more likely than not to be occupied by non-vouchers. They'll be occupied by non-vouchers for sure. And if those non-voucher households are more likely, based on statistics that we show, to be white than they are to be Black in the area and in general, based on the voucher population and the non-voucher population. What is the allegation in your amended complaint or allegations about to support your statement getting rid of all 96 voucher holders? That's how many voucher holders there are, and they're all Black. That's your allegation, Mr. Daniels. Tell me what your allegation is. That's the allegation. You made it. The allegation is that all 96 voucher holders in Heartland are Black, and there are no white vouchers in Heartland, that the rule will affect only this 100% Black group. That's for persons coming in with additional vouchers. I understand the rule has an effect on the current voucher holders. That's what I'm interested in. How will that be phased in, as alleged in your complaint, not what you think today? Yes, as alleged in the complaint, it's set out in the policy. One, no new rules, but that doesn't apply. If the family's population or composition changes, you cannot renew the lease. If you sell the house, they can't lease it. If the landlord decides no longer to rent to a voucher for any reason, then they can't move any place in Heartland. If the family's housing needs change, and they will not be able to rent another unit in Heartland, they can no longer live in that house, that's how it's going to work on the existing population. That's in the complaint, setting it out, and it's the basis for saying that ultimately, all 96 will be excluded and gone. Why don't you sum up what is your best argument that Lincoln doesn't apply here? The best argument on disparate impact that Lincoln doesn't apply is, one, there's a change in the rule. The number of Blacks who are likely to be excluded from the existing Heartland population is now within the control of Heartland. It's within the control of Heartland. It doesn't make any difference how many vouchers are Black. In other places, it is the voucher population. The change in rule increases the number of Blacks who are likely to be excluded from Heartland, just like the change in the rule in Reyes increased the number of Hispanic tenants who were likely to be evicted, which is cited with approval in Lincoln. And then the second one is that this is not imposing an affirmative duty on a private landlord, which is, in fact, setting up a policy that prevents private landlords providing low-income housing to a predominant minority population. Okay. Thank you very much. We appreciate both sides' arguments, and this case is now under submission. This concludes the oral arguments for this panel this week, and I would ask the courtroom deputies to please excuse the public and the lawyers from the courtroom.